IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


BOBBY NEAL WALLACE   )
           )
v.          )  No. 2:11-0100
           )
CAROLYN W. COLVIN,   )
  Acting Commissioner of  )
  Social Security[1]    )


To: The Honorable John T. Nixon, Senior District Judge



**REPORT AND RECOMMENDATION**

   The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act.

   Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 16) should be DENIED.

---

   [1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

In September 2008, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of November 2, 2007.[2] (Tr. 10, 123-33.) He alleges disabling conditions of severely injuring his left hand, obsessive compulsive disorder, bipolar disorder, paranoid schizophrenia, psychoneurosis, panic attacks, high blood pressure, left eye blindness, and severe neck and hand pain. (Tr. 15, 168.) His applications were denied initially and upon reconsideration. (Tr. 63-74, 77-81.) On February 17, 2010, the plaintiff appeared and testified at a hearing before Administrative Law Judge Frank Letchworth ("ALJ") (tr. 28-61), and the plaintiff amended his alleged onset date to March 31, 2008. (Tr. 34.) The ALJ entered an unfavorable decision on June 16, 2010. (Tr. 10-23.) On August 3, 2011, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5.)

# II. BACKGROUND

The plaintiff was born on January 20, 1976, and he was 32 years old as of March 31, 2008, his amended alleged disability onset date. (Tr. 155.) He attended school through the eighth grade and has worked as a tree trimmer, fast food worker, stock clerk, and landscaper. (Tr. 36, 48, 176-82.)

---

[2] There is some ambiguity in the record regarding the plaintiff's original alleged disability onset date. His DIB and SSI applications allege an onset date of January 2, 2000. (Tr. 123, 130.) However, throughout the record and without explanation, the plaintiff and ALJ refer to his original alleged onset date as November 2, 2007. (Tr. 10, 12, 155, 258, 390.) Nevertheless, at the hearing, the plaintiff clearly amended his alleged onset date to March 31, 2008. (Tr. 34, 258, 267.)

## A. Chronological Background: Procedural Developments and Medical Records

On November 3, 2006, the plaintiff injured his hand in a chainsaw accident, lacerating his left ring and index fingers, and he went to the Cumberland Medical Center emergency room where Dr. Susan Pick performed surgery on his hand. (Tr. 296-97, 308-10.) Following surgery, the plaintiff followed up with Dr. Pick on a number of occasions from November 7, 2006, to February 26, 2008. (Tr. 285-95.) He continued to experience pain and frequently complained of "burning" and "pulling" sensations, as well as decreased sensation and range of motion, in his hands and fingers. *Id.* Dr. Pick encouraged the plaintiff to work on the range of motion in his fingers, and she prescribed a number of medications including Aleve, Naprosyn, Lyrica, Hydrocodone, Lorcet, Lortab, and Neurontin.[3] (Tr. 285-94.) On March 13, 2007, the plaintiff demonstrated full range of motion of his fingers, but he had "some dysesthesias[4] about the area of his previous digital nerve injury."[5] (Tr. 289.) On May 7, 2007, he reported that he had re-injured his ring finger, and he demonstrated dysesthesia but no swelling and "fairly good" range of motion in the finger. (Tr. 288.) On July 16, 2007, Dr. Pick observed that the "laceration . . . [was] completely healed" but also noted

---

[3] Aleve and Naprosyn are nonsteroidal anti-inflammatory drugs ("NSAID") used for mild to moderate pain. Saunders Pharmaceutical Word Book 24, 479 (2009) ("Saunders"). Lyrica is an anticonvulsant used to treat neuropathic pain, fibromyalgia, and generalized anxiety disorder. *Id.* at 420. Hydrocodone is a narcotic antitussive. *Id.* at 352. Lorcet and Lortab are narcotic analgesics. *Id.* at 415. Neurontin is an anti-convulsant used to treat partial-onset seizures and postherpetic neuralgia. *Id.* at 488.

[4] Dysesthesia is a "distortion of any sense, especially that of touch." Dorland's Illustrated Medical Dictionary 574 (30th ed. 2003) ("Dorland's").

[5] The plaintiff went to the Cumberland Medical Center emergency room on February 16, 2007, reporting that he had "smash[ed] [his] hand on the side of the truck with a piece of wood." (Tr. 340.) An x-ray of his left hand ring finger showed "[p]ossible disruption of the soft tissues." (Tr. 342.)

that the plaintiff had "some tenderness in the area of the laceration" as well as "some very mild swelling of his ring finger." (Tr. 286.) On February 26, 2008, the plaintiff complained of "acute burning," "pulling," and "decreased sensation at the tip" of his left ring finger. (Tr. 285.) Dr. Pick observed that he had "fairly good" range of motion but also saw evidence of decreased sensation in the finger, which she attributed to scar tissue. *Id.* A March 11, 2008 x-ray showed "[s]light soft tissue swelling" in his left hand. (Tr. 328.)

On April 16, 2008, the plaintiff presented to Jeraldine Ziegele, Ed.S., for an initial diagnostic interview. (Tr. 300-02.) He reported having experienced anxiety since adolescence and said that it had "become progressively worse" in the previous three to four years. (Tr. 300.) He related that it was "hard for [him] to be out in public" and that he "[did not] like strangers and [it was] hard for [him] to meet people." *Id.* He described having trauma in his childhood, said that he attempted suicide at age 25, and reported that, at age 27, he was incarcerated for 31 months for theft. *Id.* In a mental status examination, Ms. Ziegele observed that the plaintiff had an anxious mood and was nervous, shaking, and fidgeting. (Tr. 301.) She found that his cognitive processes were clear, his concentration "good to fair," his memory good, his insight and judgment fair, and his intelligence average. *Id.* She diagnosed him with post-traumatic stress disorder ("PTSD"), social phobia, and panic disorder with agoraphobia, and she assigned him a Global Assessment of Functioning ("GAF") score of 52.[6] (Tr. 302.) He returned to Ms. Ziegele on one occasion before apparently discontinuing treatment. (Tr. 303-04.)

---

[6] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

The plaintiff was treated at the Family Walk-In Clinic from March 2008 until July 2008 for a variety of ailments including anxiety, insomnia, and left hand and finger pain. (Tr. 352-62.) He frequently reported experiencing numbness and tingling in his left hand and demonstrated decreased range of motion in the fingers of that hand. (Tr. 354-56, 359-62.) He was prescribed Tylenol, Lortab, Lyrica, Neurontin, Valium, and Zoloft for pain and anxiety. *Id.*

On June 7, 2008, the plaintiff presented to the Cumberland Medical Center emergency room with a first degree sunburn to his face, neck, arms, and legs. (Tr. 314-18.) Treatment notes indicate that he was accompanied by his girlfriend and that he had suffered the sunburn after "standing in [the] road holding [a] sign" for six hours without wearing sunscreen or a hat. (Tr. 314, 316.)

On July 18, 2008, he presented to the Stubbs Medical Center where he was assessed with "anxiety/depression," "benzo dependence," and "narcotic dependence." (Tr. 367.) He was referred to Dr. Viswa Durvasula, whom he saw on two occasions, for anxiety. (Tr. 367, 371-73.) On July 29, 2008, the plaintiff reported having panic attacks, chest pains, shortness of breath, palpitations, and trouble sleeping. (Tr. 372.) Dr. Durvasula observed that the plaintiff was depressed and anxious with limited insight and judgment but was also alert and oriented with organized thinking, intact memory, and no hallucinations, delusions, or suicidal ideation. (Tr. 373.) Dr. Durvasula diagnosed panic disorder and PTSD and assigned the plaintiff a GAF score between 50 and 60.[7] *Id.* When the plaintiff returned on August 26, 2008, he reported that he was feeling better, sleeping better, was "less anxious," and that his "medications [were] working." (Tr. 371.) He also reported, however, that he was "[s]till anxious and [had] shakes." *Id.*

---

[7] It is not entirely clear the precise GAF score that Dr. Durvasula assigned to the plaintiff. His treatment notes provide as follows: "Axis V: 50 now GAF 60." (Tr. 373.)

The plaintiff presented to Dr. James Roth on five occasions between June 18, and September 11, 2008, for treatment of his left hand and finger pain. (Tr. 398-408.) The plaintiff reported that his most usual pain level was 7/10 and that his worst pain level was 10/10. (Tr. 398, 400, 402.) He described the pain as "constant," "more intense," "burning web space," and "worse if [he] bump[ed] it on something." *Id.* He reported that Lyrica was "not effective" but that Lortab "help[ed]." *Id.* During neurological examinations, Dr. Roth observed that the plaintiff's sensation was intact to light touch in all extremities, his strength was normal in all extremities, and his reflexes were normal. (Tr. 399-400, 402.) Dr. Roth also observed that the plaintiff did not demonstrate neurologic abnormalities except for "severe causalgia" in his left upper extremity.[8] (Tr. 399-400, 402, 405.) Dr. Roth diagnosed "RSD upper limb,"[9] "postendoscopy foreign body," and "contracture of tendon (sheath)." (Tr. 399, 401, 403, 406, 408.)

Dr. Roth administered a series of digital nerve blocks to the plaintiff's left-hand ring finger. (Tr. 399, 404-05, 407.) On July 17, 2008, the plaintiff reported that his pain had increased with medications and that he had dropped a couch on his left hand, and he requested "stronger meds." (Tr. 402.) On August 13, 2008, the plaintiff reported his belief that his pain was "getting better slowly but surely," and Dr. Roth indicated that the plaintiff was employed at Hales Furniture. (Tr. 405.) On September 11, 2008, the plaintiff again reported his belief that "digital blocks [were] effective." (Tr. 407.)

---

[8] Causalgia is "a burning pain, often accompanied by trophic skin changes, due to injury of a peripheral nerve, particularly the median nerve." Dorland's at 311.

[9] Reflex sympathetic dystrophy ("RSD") syndrome "is a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain." WebMD, "Reflex Sympathetic Dystrophy Syndrome," http://www.webmd.com/brain/reflex-sympathetic-dystrophy-syndrome.

On October 15, 2008, the plaintiff completed a questionnaire in which he reported that he cooked simple meals 1-2 times a day, did light cleaning, sometimes washed dishes and laundry, sometimes watched television, and sometimes drove with someone else in the car. (Tr. 165-66.) He reported that he was responsible for making sure that his daughter got ready and got to school but that his fiancée went shopping because he could not be around people due to his anxiety and panic attacks. (Tr. 165.)

On November 5, 2008, Dr. James Millis, a nonexamining DDS consultative physician, completed a Medical Consultant Analysis, opining that the plaintiff's physical impairments were not severe.[10] (Tr. 374-77.) On November 20, 2008, Dr. George Davis, Ph.D., a nonexamining DDS psychological consultant, completed a Psychiatric Review Technique ("PRT") and mental Residual Functional Capacity ("RFC") assessment. (Tr. 378-95.) In the PRT, Dr. Davis found that the plaintiff suffered from depression, panic disorder, PTSD, and benzodiazepine dependence (tr. 381, 383, 386), and he opined that the plaintiff had mild restriction of the activities of daily living, moderate difficulty maintaining social functioning, moderate difficulty maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 388.) In the RFC, Dr. Davis opined that the plaintiff had moderate limitations in several areas, including maintaining attention and concentration for extended periods, interacting with the general public, and adapting to changes. (Tr. 392-93.) Dr. Davis explained, however, that the plaintiff could understand and remember

_____

[10] On January 7, 2009, Dr. Nathaniel Robinson, a DDS nonexamining consultative physician, "affirmed" Dr. Millis' assessment. (Tr. 396.)

simple and detailed instructions and could perform simple and detailed tasks, interact with the public, and adapt to changes "despite some difficulty."[11]  (Tr. 394.)

The plaintiff was seen by Dr. Vijaya Patibandla from approximately November 2008 until April 2009 for a number of ailments including left hand pain, back pain, sleep apnea, schizophrenia, and generalized anxiety disorder.[12]  (Tr. 428-45.)  During physical examinations, Dr. Patibandla frequently observed loss of sensation in the plaintiff's left upper extremity and diagnosed neuropathic pain.  (Tr. 429, 431-32, 436-39, 441, 443.)  On January 12, and February 10, 2009, he noted that the plaintiff had a marked decrease in movement in his left hand.  (Tr. 431-32.) Dr. Patibandla prescribed Endocet and Soma for hand pain, Flexeril for back pain, Xanax for anxiety and schizophrenia, and oxygen at night for sleep apnea.  (Tr. 428-45.)

Dr. Patibandla also recommended that the plaintiff pursue physical therapy (tr. 435), and he attended physical therapy sessions for chronic back pain at Jamestown Regional Medical Center in October and November 2009.  (Tr. 417-27.)  A physical therapy treatment note on November 4, 2009, indicated that he had moderate difficulty getting in and out of a stretcher and had not shown improvement.  (Tr. 417.)  He was prescribed a "TENS" unit for home use.[13]  *Id.*  On November 6, 2009, the plaintiff reported to Dr. Patibandla that he had injured his back.  (Tr. 434.)  A lumbar spine x-ray showed "[n]o acute fracture or subluxation" with normal vertebral body heights and

---

[11] On January 8, 2009, Dr. P. Jeffrey Wright, Ph.D., a nonexamining DDS psychological consultant, "affirmed" Dr. Davis' assessment.  (Tr. 397.)

[12] The Court made every attempt to decipher the medical evidence of record; however, many of Dr. Patibandla's handwritten treatment notes are illegible.

[13] Transcutaneous electrical nerve stimulation ("TENS") therapy is used to relieve pain through the use of low-voltage electrical current. WebMD, "TENS," http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nervestimulation-tens-topic-overview.

intervertebral disc spaces. (Tr. 448.) A January 5, 2010 lumbar spine MRI was "[e]ssentially normal" with "[n]o significant bulging . . . of any of the discs" and "[n]o focal disc protrusion." (Tr. 447.)

On January 7, 2010, the plaintiff presented to Dr. Benjamin Johnson at the Center for Spine, Joint, and Neuromuscular Rehabilitation for consultation on his right shoulder and left hand pain. (Tr. 412-14.) The plaintiff reported that he continued to experience pain in his right hand following surgery with Dr. Pick and that he could only lift up to eight pounds. (Tr. 412.) The plaintiff indicated that his pain with no treatment was an 8/10 and that his average pain since his last treatment was a 6/10. *Id.* He described his pain as "constant and occasional with aching, burning, sharp, shooting, tingling, throbbing, numb and jerking," and he said that "[l]ying down, heat, medications, and his [TENS] unit help to lessen his pain." *Id.* In recounting the plaintiff's functional history, Dr. Johnson related that "[s]itting, standing, walking, bending, driving, coughing, stairs, pushing, pulling, twisting and using his hand seem to increase his pain." *Id.*

During a physical examination, the plaintiff's gait and station were within normal limits "except for a forward-flexed posture when his left upper extremity [was] painful." (Tr. 413.) He also demonstrated dystonia "with tenderness and triggerpoints on palpation" in his bilateral cervical and thoracic paraspinal muscles as well as "hypoesthesia in the left C7,8 distribution."[14] *Id.* Dr. Johnson diagnosed the plaintiff with myofascial pain syndrome, generalized enthesopathy, RSD,

---

[14] Dystonia is characterized by "dyskinetic movements due to disordered tonicity of muscles." Dorland's at 579. Hypoesthesia is a "dysesthesia consisting of abnormally decreased sensitivity." *Id.* at 894.

pain in his upper left extremity, and ulnar neuropathy.[15]  *Id.*  He prescribed Endocet, MS Contin, and Zanaflex;[16] advised the plaintiff to continue physical therapy and using his TENS unit; and noted that he would consider using nerve blocks "for left upper extremity causalgia."  *Id.*  The plaintiff returned to Dr. Johnson on February 3, 2010, and reported that, while his current medications were "working somewhat," his pain was unchanged.  (Tr. 415.)  He also reported that he "stay[ed] physically active by doing physical therapy and being a parent."  *Id.*

On January 19, 2010, the plaintiff presented to Dr. Richard Smith with upper back pain, shoulder pain, hand pain, anxiety, and depression.  (Tr. 409.)  The plaintiff reported that he was bipolar and had "stopped seeing his [doctor] due to missing a pill count."  *Id.*  Dr. Smith observed that the plaintiff was blind in his right eye and "[p]ositive for headaches (tension)."  *Id.*  During a physical examination, the plaintiff demonstrated normal range of motion of all major muscle groups, normal movement in his extremities, no limb or joint pain with range of motion, normal muscle tone without atrophy, no tenderness, normal coordination, normal gait, normal deep tendon reflexes, and negative straight leg raises.  (Tr. 410.)  His respiratory and cardiovascular systems were normal.  *Id.*  He also demonstrated an intact memory, appropriate affect and demeanor, normal speech, normal thought, and normal perception.  *Id.*  Dr. Smith diagnosed upper back pain, hand pain, shoulder pain, generalized anxiety, depression, obstructive sleep apnea, and decompensated COPD with exacerbation.  (Tr. 410-11.)

---

[15] Myofascial pain syndrome "refers to pain and inflammation in the body's soft tissues."  WebMD, "Myofascial Pain Syndrome," http://www.webmd.com/pain-management/guide/myofascial-pain-syndrome.  Enthesopathy is a "disorder of the muscular or tendinous attachment to bone."  Dorland's at 622.

[16] MS Contin is a narcotic analgesic, and Zanaflex is a skeletal muscle relaxant.  Saunders at 468, 773.

**B. Hearing Testimony**

At the hearing on February 17, 2010, the plaintiff was represented by counsel, and the plaintiff and Katherine Bradford, a vocational expert ("VE"), testified. (Tr. 28-61.) The plaintiff testified that he has an eighth grade education and lives with his fiancée and two children, ages twelve and six. (Tr. 40, 48.) He testified that he has a driver's license and is able to drive. (Tr. 47.)

The plaintiff related that he previously worked as a tree trimmer but that, in a workplace accident, he "mangled all the ligaments, tendons, [and] nerves . . . in [his] left ring finger." (Tr. 47, 54.) He said that, following surgery on his hand, he began experiencing "[s]harp pain," which he described as "feel[ing] like somebody just runs a knife all the way down." (Tr. 55.) The plaintiff testified that he last worked in March 2008 teaching tree climbing in Texas. (Tr. 40-41.) He said that the job ended because he could not perform the required duties due to his having "severe headaches." (Tr. 51-52.)

At the hearing, the plaintiff wore an eye patch over his right eye, and he testified that he began doing so three years earlier on the advice of Dr. Smith due to worsening headaches. (Tr. 39, 55.) He testified that he was legally blind in his right eye and that his headaches were "severe," "intense," and felt "like a big and oversized migraine" that lasted "a good hour or two, sometimes even longer." (Tr. 53, 55-56.) He said that if he were "out and about" he would have 5-6 headaches a day but that if he "stay[ed] in the house with the curtains closed [and] all the lights out," he would have headaches 2-3 times a day. (Tr. 56.)

The plaintiff testified that he also has a "ball size knot" in his right shoulder "that pops up in between [his] shoulder blade." (Tr. 53.) He said that "it runs all the way up [his] neck" and "locks up" and that "it feels like somebody's just taking a screwdriver and just digging all the way

in [his] muscle." (Tr. 56.)  He rated his average shoulder pain as an 8/10 on the pain scale and a 7/10 with medication.  *Id.*  The plaintiff testified that he takes morphine twice a day, Percocet four times a day, and Xanax three times a day and that he frequently sleeps during the day due to these medications.  (Tr. 48.)  He also testified that he has "a little bit of bipolar and mental problems" and that he has COPD and uses an oxygen tank at night to help him breathe.  (Tr. 54, 57.)

Upon inquiry by the ALJ, the plaintiff denied ever working at Hales Furniture but said that his fiancée had worked there.  (Tr. 41-43.)  The ALJ also asked whether the plaintiff had worked holding a road sign in June 2008 when he sustained a sunburn, and the plaintiff replied that he did not hold the sign but that his fiancée did.  (Tr. 42.)  He also denied working at "Crystals" in May 2008 but acknowledged that he had worked for a short time at Hardee's and Dairy Queen in 2008 after he returned from Texas.  (Tr. 42, 52-53.)  He testified that he worked at Hardee's "for a few hours" and was unable perform the job at Dairy Queen because he was "sleepy all the time" from his medications.  (Tr. 52-53.)  He acknowledged that he missed a pill count when seeing Dr. Patibandla,[17] explaining that he "was out of town."  (Tr. 45.)  He also testified that he was discharged from Dr. Roth's care after failing a urine drug screen.  (Tr. 46.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles. (Tr. 60.)  She classified the plaintiff's past job as a tree trimmer as heavy, semi-skilled work; his past job as a tree trimming supervisor as medium, skilled work; his past job as a fast food worker as light, unskilled work; his past job as a stock clerk as heavy, semi-skilled work; and his past job as a landscaper as medium, unskilled work.  (Tr. 36, 58.)

---

[17] The transcript erroneously refers to a "Dr. V.J. Vandalin."  (Tr. 45.)  Because of the similarity of the names, the Court assumes that the plaintiff was referring to Dr. Vijaya Patibandla.

For the first hypothetical question, the ALJ asked the VE whether a person would be able to obtain work if he was limited to medium exertion work, was able to understand simple and detailed instructions, had occasional difficulty interacting with other persons, and had occasional difficulty adapting to work changes, such as changes in schedules or routines. (Tr. 36.) The VE replied that a person with these limitations could perform the plaintiff's past relevant work as a landscaper and could also work in such representative occupations as cleaner, production laborer, and machine tender. (Tr. 36-37.)

Second, the ALJ asked whether a hypothetical person would be able to obtain work if he had the previous limitations but was further limited to work at the light exertional level with no more than frequent use of the left upper extremity for pushing, pulling, gripping, and grasping. (Tr. 37.) The VE testified that such a person could not perform the plaintiff's past relevant work but could work as an assembler, inspector, and machine tender. (Tr. 39.)

Third, the ALJ asked whether a hypothetical person would be able to obtain work if he were limited to light exertion work with "no more than frequent overhead gazing, upward motions of the neck," and no peripheral or binocular vision. (Tr. 58-59.) The VE replied that such a person could perform the jobs identified in the second hypothetical but that the availability of those jobs would be reduced by 15%. (Tr. 59.)

Fourth, the ALJ asked whether a hypothetical person would be able to obtain work if he had the limitations identified in hypothetical question number three and was also limited to simple instructions and no more than occasional contact with other persons. (Tr. 59.) The VE replied that these additional limitations would reduce the available jobs by 70%. *Id.* Finally, the VE testified

that, if all of the plaintiff's testimony were accepted as credible, there would not be any jobs available. (Tr. 60.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on June 16, 2010. (Tr. 10-23.) Based upon the record, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.  The claimant performed substantial gainful activity at various times in 2008. Because the claimant did not engage in substantial gainful activity at all times since November 2, 2007, the alleged onset date, further analysis of his disability claim is required (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

\*\*\*

3.  The claimant has the following severe impairments: residuals of left ring finger laceration - mild median nerve entrapment, history of blindness of the right eye since childhood, and general anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*\*\*

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he has no more than frequent use of the left upper extremity for such things as pushing and pulling, gripping and grasping. He can do no more than frequent overhead upward motions of the neck and can do no job in which peripheral vision and binocular vision is an essential job element. He is limited to work involving simple instructions with no more than occasional contact with other persons.

\*\*\*

14

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

***

7.      The claimant was born on January 20, 1976 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

***

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 2, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-23.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases);

*Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R.

§§ 404.1520(d), 416.920(d)).  The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988).  The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled.  *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant.  *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy.  20 C.F.R. § 404.1512(g); 68 Fed. Reg. 51153, 51154-55 (Aug. 6, 2003).  *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform.  *Longworth*, 402 F.3d at 595.  *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity

of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date.[18] (Tr. 12.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "residuals of left ring finger laceration – mild median nerve

---

[18] The ALJ's explanation of this finding is not at all clear and, indeed, appears contradictory. (Tr. 12-13.) As discussed in more detail below, the ALJ erroneously used the plaintiff's original alleged onset date of November 2, 2007, but considered the plaintiff's continued employment through March 2008. However, at the hearing, the plaintiff amended his alleged onset date to March 31, 2008. (Tr. 34.) Nevertheless, it appears that the ALJ found that, at the very latest, the plaintiff was not performing substantial gainful activity as of March 31, 2008, his amended alleged onset date.

entrapment, history of blindness of the right eye since childhood, and general anxiety disorder."
(Tr. 13.)  At step three, the ALJ found that the plaintiff's impairments, either singly or in
combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1.  *Id.*  At step four, the ALJ determined that the plaintiff was unable to
perform his past relevant work.  (Tr. 21.)  At step five, the ALJ found that the plaintiff could perform
the representative jobs of assembler, machine tender, and inspector.  (Tr. 22.)

### C. The Plaintiff's Assertions of Error

The plaintiff's issues are not clearly stated in his memorandum, but it appears that the
plaintiff makes the following arguments: (1) that the ALJ erred by failing to analyze the plaintiff's
claim using his amended alleged disability onset date; (2) that the ALJ failed to properly assess the
medical evidence from Dr. Johnson; and (3) that the ALJ improperly assessed the plaintiff's
subjective complaints of pain.  Docket Entry No. 17, at 6-10.

### 1. The ALJ's failure to use the amended alleged onset date was harmless error.

The plaintiff argues that the ALJ used an incorrect alleged disability onset date when
deciding his claim.  Docket Entry No. 17, at 6.  Specifically, the plaintiff contends that he amended
his alleged onset date from November 2, 2007, to March 31, 2008, but that the ALJ incorrectly
referred to the earlier date in his decision.  *Id.*  The defendant concedes that the ALJ referred to the
wrong disability onset date but argues that the error was harmless.  Docket Entry No. 20, at 10.

The Court agrees that the ALJ used the wrong alleged onset date in his decision.  At the
hearing, the plaintiff amended his alleged disability onset date to March 31, 2008, which the ALJ

"noted for the record" (tr. 34); however, in his decision, the ALJ analyzed the plaintiff's claim using the earlier date without explanation. (Tr. 12-13, 20, 23.) Absent a showing of prejudice, however, "an error in the alleged onset of disability is not itself a basis for remand." *Ehrob v. Comm'r of Soc. Sec.*, 2011 WL 977514, at *6 (E.D. Mich. March 17, 2011). *See also* Report and Recommendation entered in *Jackson v. Comm'r of Soc. Sec.*, 2012 WL 5497778, at *4-5 (S.D. Ohio Nov. 13, 2012) and adopted by the Court (finding harmless error where ALJ failed to use amended alleged onset date in decision).

In his memorandum, the plaintiff does not allege any specific prejudice that resulted from the ALJ's application of the earlier alleged onset date. The Court notes that the ALJ considered the plaintiff's employment between November 2, 2007, and March 31, 2008 (tr. 12-13), and apparently discredited him, in part, on the basis that he "alleg[ed] complete and total disability since November 2, 2007, yet the record shows that he worked after this at various times in 2008." (Tr. 20.) However, as the defendant points out, *see* Docket Entry No. 20, at 10, the ALJ was referring to the plaintiff's employment at Hales Furniture and his work as a "highway flag operator" in the summer of 2008. (Tr. 20-21, 41-42, 314-18, 405, 407.) Thus, while the ALJ noted that the plaintiff continued to work after November 2, 2007, this work continued even after the plaintiff's amended alleged onset date of March 31, 2008. Consequently, even though the ALJ erred in misidentifying the plaintiff's alleged disability onset date, the error was harmless because the ALJ's decision would have likely been the same. Moreover, as discussed in more detail below, the ALJ cited several other reasons supporting his decision, including the lack of objective medical testing and the plaintiff's poor credibility, and these reasons are supported by substantial evidence in the record.

Consequently, the ALJ's failure to use the amended alleged onset date in his decision constitutes harmless error.

**2. The ALJ properly assessed Dr. Johnson's medical findings.**

The plaintiff argues that the ALJ improperly assessed the medical evidence from Dr. Johnson.  Docket Entry No. 17, at 6-8.  Specifically, the plaintiff contends that Dr. Johnson's findings, to which the ALJ assigned great weight, support a finding of disability.  *Id.*

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c).  However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources.  A nonexamining source is "a physician, psychologist, or other acceptable medical source[19] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902.  A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]."  *Id.*  Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  *Id.*  An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the

---

[19] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[20] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to

---

[20] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[21] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

The ALJ discussed the medical evidence from Dr. Johnson in significant detail. (Tr. 18, 20-21.) The ALJ noted that when Dr. Johnson saw the plaintiff in January 2010 for a consultation on his right shoulder and left hand pain, the plaintiff reported that his pain was an 8/10 on the pain scale; that he was only able to lift eight pounds; and that he was limited in sitting, standing, walking, bending, driving, coughing, climbing stairs, pushing, pulling, twisting, and using his left hand. (Tr. 18, 412.) The ALJ also noted Dr. Johnson's findings following a physical examination:

> [The plaintiff's] gait and station were within normal limits except for forward-flexed posture when his left upper extremity was painful. He had bilateral cervical paraspinal and thoracic paraspinal dystonia with tenderness and trigger points on palpation, that seemed to recreate the usual pain pattern. His neurologic exam was abnormal due to hypoesthesia in the left C7-8 distribution. The remainder of the exam was within normal limits, including manual muscle testing and muscle stretch reflexes in all but the left upper extremity.

(Tr. 18, 413.) Dr. Johnson diagnosed the plaintiff with myofascial pain syndrome, generalized enthesopathy, RSD, extremity pain, and ulnar neuropathy, and he discussed treatment options including MS Contin and trigger point injections. *Id.* The ALJ observed that when the plaintiff

---

[21] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

returned to Dr. Johnson on February 3, 2010, he reported "that his current medication was working somewhat but he felt like he needed more;" that he had "no side effects;" and that "he stayed physically active by doing physical therapy twice a week and being a parent." (Tr. 18, 20, 415.)

The ALJ found that "the determinations of Dr. Johnson are credible because they are supported by objective medical findings and treating progress notes in the record" and gave them "great weight." (Tr. 21.) The plaintiff argues that Dr. Johnson's findings support his claim for disability and is "perplexed at how [the ALJ] could give 'great weight' to the opinions of Dr. Johnson and then issue an Unfavorable Decision." Docket Entry No. 17, at 10.

Initially, the Court observes that Dr. Johnson, whom the plaintiff saw on only two occasions for a consultative examination and follow up, is not a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506-07 (6th Cir. Feb. 9, 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). Because Dr. Johnson is not a treating source, the treating physician rule does not apply. The ALJ was only required to consider the evidence from Dr. Johnson in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c), and he clearly did so.

Second, although Dr. Johnson diagnosed the plaintiff with various conditions, he did not provide an assessment of the plaintiff's functional limitations. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical

or mental restrictions."). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (A "mere diagnosis. . . says nothing about the severity of the condition."). The limitations identified by the plaintiff in his memorandum (Docket Entry No. 17, at 3) – that he was only able to lift eight pounds and was limited in sitting, standing, walking, bending, driving, coughing, climbing stairs, pushing, pulling, twisting, and using his left hand – were clearly based on the plaintiff's own subjective reports and not on Dr. Johnson's assessment.

The Court shares the plaintiff's confusion about the ALJ's decision to give "great weight" to Dr. Johnson's findings when Dr. Johnson did not provide an assessment of the plaintiff's functional limitations. This confusion is furthered by the ALJ's failure to specify which portions of Dr. Johnson's findings that he adopted. However, the Court does not agree with the plaintiff that Dr. Johnson's findings are "clearly supportive" of his claim (Docket Entry No. 17, at 10). Upon review, it is apparent that the ALJ included limitations consistent with Dr. Johnson's physical and neurologic examinations.

As the ALJ observed, the plaintiff's physical examination with Dr. Johnson was essentially normal "except for forward-flexed posture when his left upper extremity was painful" and "bilateral cervical paraspinal and thoracic paraspinal dystonia with tenderness and trigger points on palpation." (Tr. 18, 413.) His neurologic examination was within normal limits except for hypoesthesia in the left C7-8 distribution. (Tr. 18, 20, 413.) The ALJ incorporated these findings into the plaintiff's RFC by including limitations for "no more than frequent use of the left upper extremity for such things as pushing and pulling, gripping and grasping" and "no more than frequent overhead upward motions of the neck." (Tr. 14.)

Contrary to the plaintiff's argument, neither these findings nor Dr. Johnson's diagnoses are themselves indicative of disability. The Court concludes that the ALJ did not err in evaluating Dr. Johnson's findings. The ALJ appropriately considered Dr. Johnson's findings and explained the weight that he gave to them. Although, the ALJ's explanation is vague, he clearly included limitations regarding the plaintiff's ability to use his neck and left upper extremity based upon Dr. Johnson's findings. There is substantial evidence in the record to support the ALJ's assessment of the medical evidence from Dr. Johnson.

### 3. The ALJ properly assessed the plaintiff's subjective complaints.

Although this issue is not clearly stated in his memorandum, the plaintiff appears to argue that the ALJ erred in evaluating his subjective complaints of pain. Docket Entry No. 17, at 8-10.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and

other relevant evidence. *Id.* at \*5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at \*11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at \*4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[22] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged

---

[22] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

symptoms.  (Tr. 20.)  Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c).  The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements.  20 C.F.R. § 404.1529(c)(2).  Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[23]

Here, the ALJ set forth a detailed analysis evaluating several factors in 20 C.F.R. § 404.1529(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling. (Tr. 14-21)  Relying on the plaintiff's testimony and the medical record, the ALJ discussed, *inter alia*, the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; the plaintiff's treatment history; and several other factors regarding the plaintiff's allegations of pain.  *Id.*  Additionally, the ALJ found that:

> [I]n addition to having spent some three years in a penitentiary for a theft conviction, the claimant subsequently was discharged by a treating physician for a missed pill

---

[23] The seven factors include: (I) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

count (suggesting drug abuse and/or diversion) . . . and has also failed a urine drug screen for THC,[24] none of which enhances his overall credibility. His serial denials of having reported doing work as a highway flag operator and working for Hale[s] Furniture are similarly unimpressive.

(Tr. 20-21.)

The plaintiff's argument appears to be that his diagnoses of severe causalgia, RSD, and COPD were capable of causing disabling pain. Docket Entry No. 17, at 8-10. The ALJ considered this evidence, noting that Dr. Smith diagnosed COPD and that Dr. Roth diagnosed severe causalgia and RSD. (Tr. 17, 19.) As noted above, however, a diagnosis alone does not render an impairment disabling. Rather, the impairment must be accompanied by evidence of functional limitations rendering the plaintiff unable to work. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). In this regard, the ALJ noted that nerve conduction testing by Dr. Roth of the left upper extremity revealed mild median nerve entrapment and that "[n]eurological examination indicated that there was intact to light touch sensation in all extremities, [and] strength was normal in all extremities." (Tr. 17.) The ALJ also noted that physical and neurological examinations by Dr. Smith showed "normal range of motion of all major muscle groups, normal movement in all extremities, no limb or joint pain with range of motion, normal overall tone with no effusion, heat or redness, no muscle atrophy or fasciculation and no tenderness[,] . . . normal gait, normal deep tendon reflexes and negative straight leg raises." (Tr. 19.)

---

[24] In his memorandum, the plaintiff contends that "Dr. Johnson gave [him] a urinary drug screen which proved [he] was taking his prescribed medications *only*." Docket Entry No. 17, at 8 (emphasis in original). The plaintiff thus implies that he did not fail a urine drug screen for THC. However, the plaintiff testified that it was Dr. Roth who discharged him because he "had some marijuana in [his] system." (Tr. 46.)

30

The ALJ concluded that the plaintiff's allegations were not credible to the extent they were inconsistent with the ALJ's RFC formulation. (Tr. 20.) The ALJ had sufficient basis for reaching this conclusion and appropriately explained his reasons for finding the plaintiff not entirely credible. The ALJ complied with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 404.1529 in evaluating the plaintiff's subjective complaints.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 16) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge